UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

_____

In re:

      Cornerstone Homes, Inc.,            Bankruptcy Case No. 13-21103-PRW
                                          Chapter 11


                Debtor.

_____

      Michael H. Arnold,
      as Chapter 11 Trustee,

                Plaintiff,

         vs.                       Adversary Proceeding No. 16-2005-PRW

      First Citizens National Bank,

                Defendant.

_____

      Michael H. Arnold,
      as Chapter 11 Trustee,

                Plaintiff,

         vs.                       Adversary Proceeding No. 16-2007-PRW

      Community Preservation Corporation,

                Defendant.

_____


**DECISION AND ORDER
DENYING MOTIONS TO DISMISS
CAUSES OF ACTION ALLEGING
ACTUAL AND CONSTRUCTIVE FRAUD**


PAUL R. WARREN, United States Bankruptcy Judge

      The Chapter 11 Trustee ("Trustee") brought suit against several commercial lenders in

connection with similarly structured—but distinct—loans made to Cornerstone Homes, Inc., the

Chapter 11 debtor ("Cornerstone"). For the sake of simplicity, the commercial lenders will be referred to collectively as "banks"—with apologies to the dictionary definition of the word. The adversary proceedings in the caption of this decision are two of those actions. The causes of action at issue in each of the Trustee's complaints allege substantially similar facts and identical causes of action. The defendant in each of these actions has moved to dismiss certain of the causes of action in the complaints, under Rule 12(b) FRCP. Because the relevant causes of action in each complaint and the corresponding motion to dismiss are substantially similar in all meaningful respects, the Court will address the issues raised by both motions to dismiss in a single decision, as permitted by Rule 42(a)(1) FRCP. However, the actions are not being consolidated by the Court under Rule 42(a)(2) FRCP, at this time.

In both complaints, the Trustee claims that cash infusions provided by the banks enabled David Fleet ("Fleet"), Cornerstone's tarnished former principal, to operate a Ponzi scheme[1]—by which Fleet successfully duped hundreds of unsophisticated private investors out of millions of dollars. (*See* Case No. 16-2007, ECF No. 7 at 1-4; Case No. 16-2005, ECF No. 7 at 1-4; *see also Sec. & Exch. Comm'n v. Fleet*, Case No. 14-cv-06695-MAT (W.D.N.Y. 2014)). As the Trustee sees it, the banks knew or should have known of Cornerstone's financial—and perhaps moral— insolvency, as well as its long-running Ponzi scheme, at the time the banks made each of the loans to Cornerstone. (*See* Case No. 16-2007, ECF No. 7 at 1-4; Case No. 16-2005, ECF No. 7 at 1-4).

Rather than answering the complaints, Community Preservation Corporation ("CPC") and First Citizens National Bank ("First Citizens") have each moved under Rule 12(b) FRCP to dismiss those causes of action alleging both actual and constructive fraud under New York Debtor Creditor

---

[1]     The issue of whether the Ponzi scheme presumption applies to these adversary proceedings has not yet been formally addressed by the parties at this point in the litigation.

Law ("NYDCL"). (Case No. 16-2007, ECF No. 14 ¶¶ 3-5; Case No. 16-2005, ECF No. 16 at 2-3). The causes of action alleging actual and constructive fraud make up only a portion of the many causes of action asserted in the Trustee's complaints.[2] CPC asserts that Counts I through VIII of the Trustee's complaint should be dismissed on a variety of legal grounds—including failure to state a claim, absence of standing by operation of the doctrine of *in pari delicto*, passage of the statute of limitations—and also based on a number of factual arguments going to the merits. (Case No. 16-2007, ECF No. 14 ¶ 5). In a like manner, First Citizens asserts that Counts I through X of the Trustee's complaint should be dismissed for failure to state a claim, absence of standing by operation of the doctrine of *in pari delicto*, and the passage of the statute of limitations. (Case No. 16-2005, ECF No. 16 at 2-3).

Under the pleading standard established by the Supreme Court in *Iqbal* and *Twombly*, and the heightened pleading standard required for claims alleging fraud as required by Rule 9(b) FRCP, the Court finds that the Trustee has adequately pled the claims for actual and constructive fraud, to survive a motion to dismiss under Rule 12(b)(6). *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Further, the common law defense of *in pari delicto*—and the related federal rule of standing under the *Wagoner* rule—do not, as a matter of law, strip the Trustee of standing to pursue the avoidance actions, brought under 11 U.S.C. § 544(b). *See In re Connie's Trading Corp.*, No. 14 Civ. 376 (LAK) (GWG), 2014 U.S. Dist. LEXIS 63730, at *16-17 (S.D.N.Y. May 8, 2014); *In re Madoff*, 848 F. Supp. 2d 469, 483 (S.D.N.Y. 2012), *aff'd sub nom In re Bernard L. Madoff Inv. Secs. LLC*, 740 F.3d 81 (2d Cir. 2014).

---

[2]     The Trustee's complaint against CPC asserts 18 causes of action. And the Trustee's complaint against First Citizens asserts 23 causes of action. Wow! One would be hard-pressed to find a finer example of blunderbuss pleading. *See In re Lunn*, No. 16-20163, 2016 Bankr. LEXIS 3459, at *8 & n.5 (Bankr. W.D.N.Y. Sept. 23, 2016).

As for the statute of limitations defense raised with respect to Counts I and II of each complaint, the Court finds that questions of fact exist concerning when the alleged fraud was or could have been discovered—starting the clock ticking on the statute of limitations—making a determination on that issue premature. CPC's motion to dismiss Counts I through VIII of the complaint is **DENIED**. First Citizens' motion to dismiss Counts I through X of the complaint is also **DENIED**.

# I.

## JURISDICTION

The Court has jurisdiction of these actions under 28 U.S.C. §§ 157(a), 157(b)(1) and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(H).

# II.

## FACTS

### A. <u>Cornerstone's Business Model</u>

Fleet founded Cornerstone in 1999.[3] (Case No. 16-2007, ECF No. 7 ¶ 16).[4] Until his termination by the Chapter 11 Trustee on January 31, 2014, Fleet acted as the sole director and officer of Cornerstone. (*Id.* ¶¶ 17-19). Using the proceeds of loans that Fleet solicited from individual private investors over many years, Cornerstone purchased and then rehabilitated hundreds upon hundreds of (mostly) single family homes located throughout the Southern Tier of

---

[3] The facts—taken from the Trustee's complaint—are assumed to be true for purposes of determining the issues raised in the motions to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Done v. Option One Mortg.*, No. 09-CV-4770 (JFB), 2011 U.S. Dist. LEXIS 34189, at *7-8 (E.D.N.Y. Mar. 30, 2011).

[4] Because the first 67 paragraphs of the Trustee's complaint in each action are nearly identical, the Court will refer only to the complaint against CPC, to avoid needless duplication.

4

New York. (*See id.* ¶¶ 29, 51). Cornerstone then sold those rehabilitated homes to high-risk low-income borrowers, most of whom would not have qualified for conventional mortgage borrowing—with the goal being to help less fortunate folks buy a home. (*See id.* ¶ 51). But, what may have begun as a socially laudable endeavor by Cornerstone, is alleged by the Trustee to have become a get-rich-quick scheme for its founder—with a business model built on shaky footers. The problem with Cornerstone's business model—leaving aside for a moment the alleged Ponzi scheme—was that (not surprisingly) its high-risk, low-income borrowers were often financially ill-equipped to repay Cornerstone the mortgage loans on their homes. (*See id.* ¶ 96). As a result, the cash flow from the high-risk home loans was not sufficient to enable Cornerstone to meet its financial obligations to its individual investors. (*Id.* ¶ 21).

According to the Trustee, at some point Fleet began operating Cornerstone as a Ponzi scheme, by using the money from new private investor loans to repay the notes held by earlier private investors. (*Id.* ¶ 21). Cornerstone, acting through Fleet, needed more cash to continue its operations. (*Id.*). To attract additional investments in Cornerstone, Fleet sent letters and informational packets to both existing and potential new investors concerning Cornerstone's sound business model and financial health. (*Id.* ¶¶ 28-38). In these communications, Fleet promised investors double-digit returns and a "safe refuge" for their money away from the volatile stock market, protected by the self-proclaimed sound financial footing of Cornerstone. (*Id.*). Fleet also represented to investors that Cornerstone did not use any bank financing—a more expensive source of financing that Fleet proudly avoided—or so he claimed. (*See id.* ¶ 30).

Cornerstone's real estate empire became quite large. By 2005, Cornerstone had borrowed in excess of $12.7 million from individual investors. (*Id.* ¶ 45). For a time, Cornerstone's individual investors received a mortgage on Cornerstone real property, as collateral security for their loans to

5

Cornerstone. (*See id.* ¶¶ 30, 38). However, Cornerstone was unable to generate the cash flow necessary to make good on Fleet's promise to investors of double-digit returns on their investments. (*Id.* ¶¶ 44-46). Beginning in 2006, Fleet also sought and obtained loans from commercial lenders, including CPC and First Citizens, while continuing to represent to investors that Cornerstone did not utilize bank financing. (*Id.* ¶ 46). The Trustee claims that, at the time of the loans at issue, Cornerstone was insolvent. (*Id.* ¶ 39).

**B.** **CPC's Loans to Cornerstone**

From 2006 to 2009, CPC entered into five separate loan transactions with Cornerstone (CPC#1 Loan, CPC#2 Loan, CPC#3 Loan, CPC#4 Loan, CPC#5 Loan), by which CPC loaned Cornerstone in excess of $12.7 million. (*Id.* ¶¶ 15, 69-70, 73-74, 82, 90-91, 93). The purpose of the various CPC loans was to refinance the debt that Cornerstone owed to its hundreds of private investors. (*Id.* ¶ 47, 83, 94). To that end, the CPC#1, CPC#2, CPC#4, and CPC#5 Loans consolidated the debt owed on certain of the private investor notes and mortgages. (*Id.* ¶¶ 69-70, 73-74, 90-91, 93-94). Before closing on the CPC#1 and CPC#2 Loans, CPC required that private investors execute written assignments to CPC of their Cornerstone notes and the mortgages securing those notes. (*Id.* ¶¶ 71, 75).[5] The CPC #1 Loan and CPC#2 Loan were structured so that certain of the loan proceeds were earmarked for payment of the amounts owed by Cornerstone to those individual private investors who assigned to CPC their mortgages and the debt secured by those mortgages. (*Id.* ¶¶ 72, 76). That practice changed, however. CPC did not require assignment of the

---

[5] The Trustee previously challenged the validity of these Consolidated Notes and Mortgages. This Court ruled that the Consolidated Notes and Mortgages are enforceable, secured, and CPC and First Citizens have standing to enforce their Consolidated Notes and Mortgages. *See Arnold v. First Citizens Nat'l Bank*, 544 B.R. 492, 494-95 (Bankr. W.D.N.Y. 2015). That decision was affirmed on appeal by the District Court. *Arnold v. First Citizens Nat'l Bank*, No. 16-cv-6012-FPG, 2016 U.S. Dist. LEXIS 160064 (W.D.N.Y. Nov. 18, 2016).

6

private investors' mortgages in connection with the CPC#3 Loan, and only a small portion of the proceeds of that loan were paid to the private investors. (*Id.* ¶ 84). Instead, most of the loan proceeds went directly to Cornerstone. (*Id.*). As for the CPC#4 Loan, none of the loan proceeds were paid to Cornerstone's private investors. (*Id.* ¶ 92). Similarly, none of the proceeds from the CPC#5 Loan were paid to Cornerstone's private investors. (*Id.* ¶ 95).

As a part of its due diligence in making those loans, CPC required Cornerstone to provide audited financial statements and tax returns. (*Id.* ¶ 57). Cornerstone's tax returns and financial statements for 2003 to 2005 reported net losses and estimated that its total liabilities exceeded its total assets—showing, in the Trustee's view, that Cornerstone was insolvent. (*Id.* ¶¶ 60, 63, 66). For 2006 to 2009, Cornerstone's tax returns reported insolvency, but its financial statements reported solvency. (*Id.* ¶¶ 78-79, 86-87, 126-27, 129-30). The financial statements explained that there were discrepancies between Cornerstone's 2006-2009 tax returns and financial statements because the financial statements recognized, as income, amounts that had not actually been received by Cornerstone. (*Id.* ¶¶ 79, 87, 127, 130).

## C.  First Citizens' Loans to Cornerstone

Also from 2006 to 2009, First Citizens entered into five separate loan transactions with Cornerstone ("FC#1 Loan, FC#2 Loan, FC#3 Loan, FC#4 Loan, FC#5 Loan"), by which First Citizens loaned Cornerstone in excess of $7.1 million. (Case No. 16-2005, ECF No. 7 ¶¶ 15, 74, 82, 93, 105, 111). The purpose of the First Citizens loans was to refinance the debt that Cornerstone owed to its hundreds of private investors. (*Id.* ¶ 47). Before making the FC#1 and FC#2 Loans, First Citizens required that Cornerstone transfer 83 parcels of real property that would secure those loans to a separate, newly formed entity called CNY Homes. (*Id.* ¶¶ 69-71, 73, 81). According to the Trustee, this was done "in an apparent attempt to insulate [First Citizens] from

7

Debtor's suspicious business" and to "insulate such real property from the claims of Debtor's other creditors." (*Id.* ¶¶ 69, 71). Before closing on the FC#1 and FC#2 Loans, First Citizens also required that private investors execute written assignments to First Citizens of their Cornerstone notes and the mortgages securing those notes. (*Id.* ¶¶ 76, 84). After the transfers to CNY Homes were complete, and after the private investors executed written assignments, First Citizens made the FC#1 and FC#2 Loans to Cornerstone. (*Id.* ¶¶ 74-75, 82-83). These loans consolidated the debt owed on certain of the private investor notes and mortgages. (*Id.*). The FC#1 Loan and FC#2 Loan were structured so that certain of the loan proceeds were earmarked for payment of the amounts owed by Cornerstone to those individual private investors who assigned to First Citizens their mortgages and the debt secured by those mortgages. (*Id.* ¶¶ 78, 87).

The subsequent three loans made by First Citizens to Cornerstone were structured differently. The FC#3 Loan was a revolving credit facility secured by a second mortgage on the FC#1 and FC#2 properties. (*Id.* ¶ 94). The FC#4 and FC#5 Loans, on the other hand, were extended to "restructure a portion of Cornerstone Homes, Inc. debt to private investors." (*Id.* ¶¶ 106, 112). Unlike First Citizens' first two loan agreements with Cornerstone, First Citizens did not require assignment of the private investors' notes and mortgages in connection with those loans. (*Id.* ¶¶ 110, 116). Additionally, none of the proceeds of those loans were designated for payment to the private investors—instead directing payment to Cornerstone. (*Id.*).

Like CPC, First Citizens performed due diligence before entering into loan agreements with Cornerstone. As a part of that due diligence, First Citizens required Cornerstone to provide audited financial statements and tax returns from 2003 to 2009. (*Id.* ¶ 57). As was previously mentioned, those financial statements and tax returns reflected insolvency in some documents and solvency in others. (*Id.* ¶¶ 59, 62, 65, 90, 102, 149, 152).

8

D.     **Collapse of the Alleged Ponzi Scheme**

By 2005, Cornerstone had over $11 million in private investor loans that were secured by real estate collateral. (Case No. 16-2007, ECF No. 7 ¶ 103; Case No. 16-2005, ECF No. 7 ¶ 124). Until 2005, each of the private investor loans was secured by a mortgage on real property. (Case No. 16-2007, ECF No. 7 ¶ 103; Case No. 16-2005, ECF No. 7 ¶ 124). Beginning in 2006, Fleet began to solicit *unsecured* loans from Cornerstone's private investors. (Case No. 16-2007, ECF No. 7 ¶¶ 98-101; Case No. 16-2005, ECF No. 7 ¶¶ 120-22). By 2010, private individuals had invested over $15 million in Cornerstone, on an unsecured basis. (Case No. 16-2007, ECF No. 7 ¶ 103; Case No. 16-2005, ECF No. 7 ¶ 124). According to the Trustee, "[t]he financing provided by [CPC and First Citizens] enabled Debtor to pay 'private investors' and contributed to the false impression that Fleet was operating a legitimate, profitable business. Fleet used the false sense of security resulting from the payment of the secured 'private investor' loans to entice individuals to loan additional funds to Debtor on an unsecured basis, thus enabling Fleet to perpetuate and expand the Ponzi scheme." (Case No. 16-2007, ECF No. 7 ¶ 100; Case No. 16-2005, ECF No. 7 ¶ 121).

The Trustee alleges that, in 2010, as the alleged Ponzi scheme was collapsing, Fleet paid off the remaining mortgages held by private investors—using the newly unencumbered real property as collateral to attempt to negotiate forbearance agreements with CPC and First Citizens. (Case No. 16-2007, ECF No. 7 ¶ 132; Case No. 16-2005, ECF No. 7 ¶¶ 137-39). Fleet successfully negotiated a forbearance agreement with First Citizens, by which First Citizens accepted millions of dollars of additional collateral from Cornerstone, as further security for the obligations incurred by Cornerstone ("Forbearance Transfers"). (Case No. 16-2005, ECF No. 7 ¶ 154). Fleet continued to make debt service payments to CPC and First Citizens—to protect against personal liability on guarantees he had given to the banks—depleting the remaining funds that Cornerstone otherwise

9

would have had available to pay unsecured private investors.  (Case No. 16-2007, ECF No. 7 ¶ 133; Case No. 16-2005, ECF No. 7 ¶¶ 137-39).

Because CPC and First Citizens had detailed information concerning Cornerstone's precarious financial footing—obtained through their pre-loan due diligence investigations—the Trustee alleges that the banks knew or should have known that Cornerstone "was, at all relevant times, insolvent, raising millions of dollars each year from 'private investors,' and dependent upon these 'private investor' loans to fund [Cornerstone's] financial obligations, including its obligations to the 'private investors' and [CPC and First Citizens]."  (Case No. 16-2007, ECF No. 7 ¶ 58; Case No. 16-2005, ECF No. 7 ¶ 58).  The Trustee alleges that CPC and First Citizens knew or should have known that Cornerstone was operating as a Ponzi scheme; that the high-risk purchasers of Cornerstone's properties would likely default on their obligations to repay Cornerstone; that private investor loans were being used to support Cornerstone's negative cash flow arising from its operations and prior financial obligations; and that upon the inevitable collapse of the Ponzi scheme, the debt to CPC and First Citizens would be collaterally secured by real property, while the debt owed to the private investors would be unsecured.  (Case No. 16-2007, ECF No. 7 ¶ 96; Case No. 16-2005, ECF No. 7 ¶ 117).  In the complaints, the Trustee asserts multiple causes of action against the banks, alleging both actual fraud and constructive fraud.  The Trustee seeks, as a remedy, avoidance of the obligations incurred and the conveyances made by Cornerstone to CPC and First Citizens (to be specific, the "CPC#1 Transfer, CPC#2 Transfer, CPC#3 Transfer, CPC#4 Transfer, CPC#5 Transfer, FC#1 Transfer, FC#2 Transfer, FC#3 Transfer, FC#4 Transfer, FC#5 Transfer, Forbearance Transfer").

## III.

## QUESTION PRESENTED

The issue is whether the Trustee has sufficiently pled each of the causes of action alleging either actual fraud or constructive fraud, to survive the motions to dismiss by CPC and First Citizens.  In the Court's view, the answer is yes.

## IV.

## DISCUSSION

**A.**     **The Trustee Has Adequately Pled Claims for Actual Fraud and Constructive Fraud Under Rule 12(b)(6), Rule 9(b), and Rule 8(a) FRCP.**

   **1.**     *Motions to Dismiss Under Rule 12(b)(6)—Standard Applied*

When considering a motion under Rule 12(b)(6), seeking dismissal of a complaint for failure to state a claim upon which relief can be granted, the Court must accept factual allegations in the complaint as true.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006).  The Court must draw reasonable inferences from the complaint in favor of the plaintiff, in determining whether the plaintiff provides "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016); *Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010); *see also Wacker v. JP Morgan Chase & Co.*, No. 16-2482-cv (L), 2017 U.S. App. LEXIS 1763, at *2 (2d Cir. Feb. 1, 2017).  A complaint is plausible on its face when it contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678.  While the facts alleged in a complaint may turn out to be "self-serving and

11

untrue," "a court at this stage of [a] proceeding is not engaged in an effort to determine the true facts. The issue is simply whether the facts the plaintiff alleges, if true, are plausibly sufficient to state a legal claim." *Columbia Univ.*, 831 F.3d at 48. Further, the court should not consider facts outside the "four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007); *Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 776 (2d Cir. 2002).

**2.** ***Claims Alleging Actual Fraud (Counts I–V of CPC Complaint & Counts I-VI of First Citizens Complaint)***

Counts I through V of the Trustee's complaint against CPC allege causes of action sounding in actual fraud—under NYDCL §§ 276 and 276-a—seeking, as a remedy, to set aside each of the transfers made in connection with the CPC#1 through CPC#5 Loans. (Case No. 16-2007, ECF No. 7 ¶¶ 147-181). Counts I through VI of the Trustee's complaint against First Citizens also allege causes of action for actual fraud under New York Law—seeking, as a remedy, to set aside each of the transfers made in connection with the FC#1 through FC#5 Loans and the Forbearance Transfers. (Case No. 16-2005, ECF No. 7 ¶¶ 171-212). Section 276 of the NYDCL provides:

> Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

Rule 9(b) FRCP and Rule 7009 FRBP establish a heightened pleading standard for claims alleging intentional fraud—such as claims brought under NYDCL § 276. *In re Bernard L. Madoff Inv. Secs. LLC*, 454 B.R. 317, 329 (Bankr. S.D.N.Y. 2011) (citing *Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 351 F. Supp. 2d 79, 106–07 (S.D.N.Y. 2004); *In re Andrew Velez Constr., Inc.*, 373 B.R. 262, 269 (Bankr. S.D.N.Y. 2007)). The plaintiff must "state with particularity the circumstances constituting fraud or mistake." Rule 9(b) FRCP. To identify these circumstances with the particularity required by Rule 9(b) FRCP, "a party must ordinarily allege:

12

(1) the property that was conveyed; (2) the timing and, if applicable, frequency of the transfer; and (3) the consideration paid for the transfer." *Bernard L. Madoff Inv. Secs. LLC*, 454 B.R. at 329 (citing *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F. Supp. 2d 198, 221 (S.D.N.Y. 2002)); *see also In re Geltzer*, 502 B.R. 760, 769 (Bankr. S.D.N.Y. 2013); *In re Arbco Capital Mgmt., LLP*, 498 B.R. 32, 40 (Bankr. S.D.N.Y. 2013). The "particularity requirement" for claims alleging actual fraud serves three purposes: "(1) enabling a defendant to identify the allegedly fraudulent behavior in order to mount a defense with regard to those actions; (2) protecting the defendant by prohibiting a complainant from making character-damaging allegations that have no basis in provable fact; and (3) reducing the number of strike suits." *In re Saba Enters., Inc.*, 421 B.R. 626, 641 (Bankr. S.D.N.Y. 2009); *see also Geo-Grp. Commc'ns, Inc. v. Chopra*, No. 15 Civ. 1756 (KPF), 2016 U.S. Dist. LEXIS 11808, at *15 n.3 (S.D.N.Y. Feb. 1, 2016).

While Rule 9(b) requires that a plaintiff alleging actual fraud identify with particularity the facts and circumstances giving rise to the claim, the element of intent may be alleged generally. *See* Rule 9(b) FRCP; *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994), *superseded by statute on other grounds*; *see also Arbco Capital Mgmt., LLP*, 498 B.R. at 40; *Saba Enters.*, 421 B.R. at 642. Plaintiffs are required "to allege facts that give rise to a strong inference of fraudulent intent." *Shields*, 25 F.3d at 1128. A strong inference of fraudulent intent "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id*. The Trustee may rely on the following badges of fraud in providing circumstantial evidence sufficient to establish fraudulent intent:

(i) a close relationship among the parties to the transaction;

(ii) a questionable or hasty transfer not in the ordinary course of business;

13

(iii) the existence of an unconscionable discrepancy between the value of the property transferred and the consideration received therefor;

(iv) the chronology of the events and transactions under inquiry;

(v) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurrence of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and

(vi) whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

*In re Lehman Bros. Holdings Inc.*, 469 B.R. 415, 447 (Bankr. S.D.N.Y. 2012) (citing *In re Kaiser*, 722 F.2d 1574, 1582–83 (2d Cir. 1983); *In re Enron Corp.*, 328 B.R. 58, 73-74 (Bankr. S.D.N.Y. 2005)); *see Saba Enters., Inc.,* 421 B.R. at 643-44 (holding that the existence of several badges of fraud constitutes clear and convincing evidence of actual intent); *see also Gordon v. Livecchi,* No. 11-2027-PRW, 2014 Bankr. LEXIS 4804, at *31-32 (Bankr. W.D.N.Y. Nov. 20, 2014).

Courts in the Second Circuit are divided on whether the plaintiff need only plead the fraudulent intent of the *transferor* under the NYDCL—or whether the fraudulent intent of the *transferee* must also be pled. *In re Bernard L. Madoff Inv. Secs. LLC*, 440 B.R. 243, 257 (Bankr. S.D.N.Y. 2010) (recognizing the split in authority and assuming, for purposes of the motion to dismiss, that the Trustee must have pled the fraudulent intent of both the transferor and the transferee); *see In re Sharp Int'l Corp.*, 403 F.3d 43, 56 (2d Cir. 2005) (looking only to the transferor's intent); *In re Dreier LLP*, 452 B.R. 391, 401 (Bankr. S.D.N.Y. 2011) (stating that the intent of the transferee need not be pled). *But see In re Marketxt Holdings Corp.*, 361 B.R. 369, 396 (Bankr. S.D.N.Y. 2007) (requiring that both the intent of the transferor and the transferee be pled); *In re Park S. Secs., LLC*, 326 B.R. 505, 517 (Bankr. S.D.N.Y. 2005) (same). If actual intent is adequately pled under NYDCL § 276, the claim is "deemed sufficiently stated without an

Case 2-16-02007-PRW    Doc 21    Filed 02/07/17    Entered 02/07/17 15:49:14    Desc Main
Document    Page 14 of 27

independent inquiry into the adequacy of consideration given in connection with a transfer." *Saba Enters., Inc.,* 421 B.R. at 640.

When the plaintiff asserting a claim sounding in actual fraud is the bankruptcy trustee, the court should adopt "a more liberal view . . . since a 'trustee is an outsider to the transaction who must plead fraud from second-hand knowledge.'" *Marketxt*, 361 B.R. at 395 (quoting *Park S. Secs. LLC*, 326 B.R. at 517-18; *see also Bernard L. Madoff Inv. Secs. LLC*, 454 B.R. at 329. This somewhat relaxed Rule 9 standard does not mean that the particularity requirement is altogether eliminated. *See Devaney v. Chester*, 813 F.2d 566, 569 (2d Cir. 1987). The Second Circuit has stated that the degree of particularity should be determined in light of the circumstances of the case, such as the opportunity for discovery. *Id.*

CPC argues that the Trustee's claims sounding in actual fraud should be dismissed under Rule 12(b)(6) and Rule 9(b) FRCP because the Complaint is "rife with conclusory allegations and is bereft of actual factual allegations that would support the conclusions plead [sic]." (Case No 16-2007, ECF No. 14 ¶ 42). In the motion to dismiss, CPC quibbles over certain of the facts alleged in the complaint—offering alternative facts—and even offering additional facts not asserted in the complaint. (*See id.* ¶¶ 46-62). For instance, in response to the claim that Cornerstone expanded the alleged ongoing Ponzi scheme by refinancing individual investor loans with the proceeds of CPC loans, CPC argues that the terms of its loans to Cornerstone—with lower interest rates and longer amortization than the individual investors' notes—demonstrate that CPC's lending allowed Cornerstone to retire debt to the individual investors holding mortgages. (*Id.* ¶¶ 46-48). CPC also asserts that the facts do not support a showing that CPC had knowledge of an ongoing Ponzi scheme. (*Id.* ¶ 50). Rather, "CPC made the loans based on the values of the real estate being pledged as collateral . . . ." (*Id.*). Attempting to refute the Trustee's allegation that Cornerstone's

15

financial statements and tax returns showed Cornerstone to be insolvent, CPC offers its own extensive history of the due diligence that CPC performed in making the loans to Cornerstone—complete with details about appraisals, its treatment of the Cornerstone properties as inventory, its accountants' views of Cornerstone's financial ability to perform, and so on. (*Id.* ¶¶ 51-62). These facts do not appear in the complaint.

The counter-statement of facts offered by CPC is of no use in connection with its motion to dismiss the complaint under Rule 12(b)(6) and Rule 9(b) FRCP. The Court is required to limit its consideration to the facts asserted in the complaint, and the Court must draw all reasonable inferences in favor of the plaintiff. *See Columbia Univ.*, 831 F.3d at 48; *McCarthy*, 482 F.3d at 191. At this early stage of litigation—before the opportunity for discovery and the presentation of evidence—the Court is not called on to determine the truth of the facts asserted by the Trustee. The Court can only consider whether the facts alleged in the complaint, if true, state a plausible legal claim of actual fraud. *Columbia Univ.*, 831 F.3d at 48.

First Citizens also attacks the sufficiency of the fraud claims in the Trustee's complaint, arguing that the complaint merely recites the elements of actual fraud without factual support. (Case No. 16-2007, ECF No. 16 at 10-14). First Citizens asserts that the complaint does not identify with particularity the "conveyances" and "obligations" that the Trustee seeks to avoid, by failing to allege the specific property that was conveyed, the timing, and the consideration. (*Id.* at 11-12.). Additionally, First Citizens claims that the complaint does not contain factual allegations describing how and why the transfers were fraudulent. (*Id.* at 12-14).

In the Court's view, the facts alleged by the Trustee do state a plausible claim for actual fraud. The Court finds that the Trustee has met the "particularity requirement" by sufficiently alleging the circumstances of the alleged fraudulent conveyances. *See Bernard L. Madoff Inv. Secs.*

16

*LLC*, 454 B.R. at 329. First, the Trustee identified the specific property that was conveyed—the CPC#1, CPC#2, CPC#3, CPC#4, CPC#5 Transfers, as well as the FC#1, FC#2, FC#3, FC#4, FC#5, and the Forbearance Transfers. (Case No. 16-2007, ECF No. 7 ¶¶ 148, 155, 162, 169, 176; Case No. 16-2005, ECF No. 7 ¶¶ 172, 179, 186, 193, 200, 207). Next, the Trustee has detailed the timing of those transfers. (Case No. 16-2007, ECF No. 7 ¶¶ 69, 73, 82, 90, 93; Case No. 16-2005, ECF No. 7 ¶¶ 74, 82, 93, 105, 111, 157). And finally, the Trustee identified the consideration exchanged for each transfer. (*See id.*). These facts satisfy the heightened pleading requirement of Rule 9(b). *See Bernard L. Madoff Inv. Secs. LLC*, 454 B.R. at 329; *see also Arbco Capital Mgmt., LLP*, 498 B.R. at 40-41 (finding that the Trustee adequately identified the fraudulent transfers under Rule 9(b) by identifying the date and amount of each transfer and the type of transfer made).

The Trustee has also sufficiently pled the element of intent in connection with the fraudulent conveyance claims, by alleging the existence of certain badges of fraud. The Court will assume, for purposes of the motions to dismiss, that both the intent of the transferor and the transferee must be pled in the complaint. *See Bernard L. Madoff Inv. Secs. LLC*, 440 B.R. at 257. As to the intent of both CPC and First Citizens, as transferees, the Trustee has pled facts showing the chronology of the banks' transactions with Cornerstone, the cumulative effect of the banks' pattern of extending Cornerstone's commercial financing, and the insolvency of Cornerstone at the time of the transactions. *See Lehman Bros. Holdings Inc.*, 469 B.R. at 447. Specifically, the Trustee has alleged that CPC and First Citizens made loans to and accepted debt service payments from Cornerstone, at a time when the banks knew or should have known that Cornerstone was insolvent—by pointing to Cornerstone's audited financial statements and tax returns. (Case No. 16-2007, ECF No. 7 ¶¶ 59-60, 62-63, 65-66, 78-79, 86-87, 126-27, 129-30; Case No. 16-2005, ECF No. 7 ¶¶ 59-60, 62-63, 65-66, 89-90, 101-02, 148-49, 151-52). The alleged effect of CPC's lending

17

pattern was to strengthen the illusion that Cornerstone was profitable—encouraging individuals to make unsecured investments in Cornerstone and enabling Cornerstone to continue the ongoing Ponzi scheme. (Case No. 16-2007, ECF No. 7 ¶ 96; Case No. 16-2005, ECF No. 7 ¶ 117). The Court finds that these facts, if proved true, would support an inference of fraudulent intent, through circumstantial evidence of "conscious misbehavior or recklessness." *See Shields*, 25 F.3d at 1128.

Additionally, the Trustee has adequately pled the fraudulent intent of Cornerstone—again by alleging the existence of several badges of fraud. The Trustee has alleged that Fleet, as principal of Cornerstone, used the CPC and First Citizens Loans to create the illusion of Cornerstone's profitability, to pay off individual investor loans, to solicit individuals to make unsecured investments in Cornerstone, and to perpetuate the alleged Ponzi scheme. (Case No. 16-2007, ECF No. 7 ¶ 96; Case No. 16-2005, ECF No. 7 ¶ 117). According to the complaint, Fleet continued to incur debt and make debt service payments to CPC and First Citizens, while Cornerstone was insolvent. (Case No. 16-2007, ECF No. 7 ¶ 133; Case No. 16-2005, ECF No. 7 ¶ 137). Again, the Trustee has pled facts that, if proved true, would demonstrate the existence of badges of fraud regarding the chronology of the transactions, their cumulative effect, and Cornerstone's financial condition. *See Lehman Bros. Holdings Inc.*, 469 B.R. at 447.

Because the Trustee has adequately pled the circumstances constituting fraud and actual intent under NYDCL § 276, the Court need not consider the sufficiency of consideration given in connection with the CPC loans. *See Saba Enters., Inc.,* 421 B.R. at 640. The Trustee has met the pleading standard for the claims asserting actual fraud with respect to the transfers at issue. The motions to dismiss those causes of action by CPC and First Citizens, under Rules 12(b)(6) and 9(b) FRCP, fail.

### 3. **Claims Alleging Constructive Fraud (Counts VI –VIII of CPC Complaint & Counts VII–X of First Citizens Complaint)**

Counts VI through VIII of the complaint against CPC are causes of action alleging constructive fraud, seeking—as a remedy—to set aside each of the transfers to CPC in connection with CPC#3 through CPC#5 Loans. (Case No. 16-2007, ECF No. 7 ¶¶ 182-199). Counts VII through X of the complaint against First Citizens are also causes of action for constructive fraud, seeking—as a remedy—to set aside the transfers made in connection with FC#3 through FC#5 Loans and those identified as the Forbearance Transfers. (Case No. 16-2005, ECF No. 7 ¶¶ 213-236). The claims are brought under 11 U.S.C. §§ 502(d), 544, 550, and 551 and NYDCL §§ 273, 274, and 275.

There is a split of authority within the Second Circuit concerning the pleading standard to be applied to claims alleging constructive fraud under the NYDCL. *Compare Geo-Grp. Commc'ns, Inc.*, 2016 U.S. Dist. LEXIS 11808, at *13-15 (applying the *plausibility* requirement of Rule 8(a) FRCP to constructive fraud claim—instead of the *particularity* standard under Rule 9(b)); *Bernard L. Madoff Inv. Secs. LLC*, 454 B.R. at 332 (same); *Friedman v. Wahrsager*, 848 F. Supp. 2d 278, 292 (E.D.N.Y. 2012) (same); *Apace Commc'ns, Ltd. v. Burke*, 522 F. Supp. 2d 509, 519-20 (W.D.N.Y. 2007) (same); *In re Enron Corp.*, No. 01-16034 (AJG), 2006 Bankr. LEXIS 4650, at *12 (Bankr. S.D.N.Y. May 11, 2006) (same), *with Marketxt Holdings Corp. v. Engel & Reiman, P.C.*, 693 F. Supp. 2d 387, 397 n.75 (S.D.N.Y. 2010) (noting the disagreement within the Second Circuit over whether Rule 9(b) applies to claims of constructive fraud and comparing cases); *Cargo Partner AG v. Albatrans Inc.*, 207 F. Supp. 2d 86, 115-16 (S.D.N.Y. 2002) (applying the particularity requirement of Rule 9(b) to constructive fraud claim), *aff'd*, 352 F.3d 41 (2d Cir. 2003)). It appears that a majority of courts in the Circuit have applied the more liberal pleading standard under Rule 8(a) FRCP, together with the plausibility requirement set forth in *Twombly* and

19

*Iqbal*, to claims alleging constructive fraud. *See Geo-Grp. Commc'ns*, 2016 U.S. Dist. LEXIS 11808, at *14-15. The rationale supporting the majority view is that *scienter* is not an element of proof in a constructive fraud claim. *In re Enron Corp.*, 2006 Bankr. LEXIS 4650, at *12 (citing *In re Ticketplanet.com*, 313 B.R. 46, 68 (Bankr. S.D.N.Y. 2004)). Thus, the purpose of Rule 9(b)—to protect defendants from plaintiffs who (with no provable basis in fact) may make character-damaging allegations of actual fraud and fraudulent intent—is not necessary with respect to a claim sounding in constructive fraud (where intent is not at issue). *Geo-Grp. Commc'ns*, 2016 U.S. Dist. LEXIS 11808, at *15 n.3 (citing *Sullivan v. Kodsi*, 373 F. Supp. 2d 302, 306 (S.D.N.Y. 2005); *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987)). This Court joins with the majority in applying the more liberal pleading standard under Rule 8(a) FRCP to the Trustee's claims alleging constructive fraud.

Article 10 of the NYDCL provides a "set of legal rather than equitable doctrines, whose purpose is not to provide equal distribution of a debtor's estate among creditors, but to aid specific creditors who have been defrauded by the transfer of a debtor's property." *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 634 (2d Cir. 1995). Sections 273, 273-a, and 274 of the NYDCL list circumstances under which a conveyance will be deemed to be a constructively fraudulent conveyance. Under NYDCL § 273, applicable to transfers by insolvent debtors, "[e]very conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." Under NYDCL § 273-a, applicable to transfers made by a defendant in an action for money damages:

> Every conveyance made without fair consideration when the person making it is a
> defendant in an action for money damages or a judgment in such an action has been
> docketed against him, is fraudulent as to the plaintiff in that action without regard to

20

the actual intent of the defendant if, after final judgment for the plaintiff, the defendant fails to satisfy the judgment.

Lack of fair consideration is a necessary element under both sections. For there to be fair consideration, two elements must be present—the transfer must have been made for fair equivalent value and received in good faith. *Dreier LLP*, 452 B.R. at 442; *see also Geo-Grp. Commc'ns*, 2016 U.S. Dist. LEXIS 11808, at *10 (citing NYDCL § 272(a); *In re Sharp Int'l Corp.*, 403 F.3d 43, 53 (2d Cir. 2005)). In the context of a motion to dismiss, however, "the [plaintiff] need only allege a lack of 'fair consideration' by pleading a lack of 'fair equivalent' value *or* a lack of good faith on the part of the transferee." *Dreier LLP*, 452 B.R. at 443 (emphasis added); *see also In re Vivaro Corp.*, 524 B.R. 536, 550 (Bankr. S.D.N.Y. 2015); *In re Dewey & LeBoeuf LLP*, No. 12-12321 (MG), 2014 Bankr. LEXIS 4051, at *34 (Bankr. S.D.N.Y. Sept. 23, 2014). Some courts have found it inappropriate to determine lack of fair consideration in connection with a motion to dismiss, because the analysis "requires more than a simple math calculation." *In re Agape World, Inc.*, 467 B.R. 556, 571-72 (Bankr. E.D.N.Y. 2012) (citing *Global Crossing Estate Rep. v. Winnick*, No. 04 Civ. 2558 (GEL), 2006 U.S. Dist. LEXIS 53785, at *33 (S.D.N.Y. Aug. 3, 2006); *In re Actrade Fin. Techs. Ltd.*, 337 B.R. 791, 804 (Bankr. S.D.N.Y. 2005)).

CPC and First Citizens argue that the claims of constructive fraud under the NYDCL should be dismissed because the complaints fail to set forth specific facts regarding the elements of fair consideration—fair equivalent value and good faith. (Case No. 16-2007, ECF No. 14 ¶¶ 105-08; Case No. 16-2005, ECF No. 16 at 14-16). The Court disagrees with the banks. Evidence of such facts is not necessary at this early stage of litigation, especially in light of the liberal pleading standard under Rule 8(a) FRCP. The question of adequacy of consideration is factual, and a determination of that issue—before discovery—is premature. *See Winnick,* 2006 U.S. Dist. LEXIS 53785, at *33; *Actrade Fin. Techs. Ltd.*, 337 B.R. at 804 ("[T]he question of 'reasonably equivalent

21

value' and 'fair equivalent' is fact intensive, and usually cannot be determined on the pleadings."). The totality of the circumstances must be considered, and the Trustee has the right to seek to discover evidence to show that Cornerstone did not receive fair consideration in exchange for the transfers. *See Am. Tissue, Inc. v. Donaldson*, 351 F. Supp. 2d 79, 106 (S.D.N.Y. 2004).

In the Court's view, the Trustee has adequately alleged the banks' lack of good faith, which satisfies the pleading standard for causes of action sounding in constructive fraud, for purposes of defeating the banks' motions to dismiss. *See Dreier LLP*, 452 B.R. at 443. Specifically, the Trustee has asserted that the banks knew or should have known that Cornerstone was insolvent at the time of each of their transactions, based on the information contained in Cornerstone's tax returns and financial statements. (Case No. 16-2007, ECF No. 7 ¶¶ 59-60, 62-63, 65-66, 78-79, 86-87, 126-27, 129-30; Case No. 16-2005, ECF No. 7 ¶¶ 59-60, 62-63, 65-66, 89-90, 101-02, 148-49, 151-52). The Trustee has also alleged that CPC and First Citizens knew or should have known of the unsustainable structure of Cornerstone's business model, that Cornerstone was operating a Ponzi scheme, and that upon the collapse of the scheme, Cornerstone's debt to CPC and First Citizens would be secured by real property, but Cornerstone's debt to its private investors would be wholly unsecured. (Case No. 16-2007, ECF No. 7 ¶ 96; Case No. 16-2005, ECF No. 7 ¶ 117). These allegations are sufficient to plead lack of good faith. The Trustee has met the pleading standard for the claims asserting constructive fraud. The motions to dismiss those causes of action, under Rule 12(b)(6) and Rule 8(a) FRCP, fail.

**B.** **The Trustee Has Standing to Bring Counts I–V of the CPC Complaint and Counts I–X of the First Citizens Complaint.**

CPC and First Citizens argue that the Trustee does not have standing to bring Counts I through V of the complaint against CPC and Counts I though X of the complaint against First Citizens, because of the common law doctrine of *in pari delicto*. (Case No. 16-2007, ECF No. 14

Case 2-16-02007-PRW    Doc 21    Filed 02/07/17    Entered 02/07/17 15:49:14    Desc Main
Document      Page 22 of 27

¶¶ 66-74; Case No. 16-2005, ECF No. 16 at 16-20). Under New York law, the *in pari delicto* doctrine is an affirmative equitable defense—barring an action by a wrongdoer, or a plaintiff asserting a claim on behalf of a wrongdoer, against another wrongdoer. *In re Bernard L. Madoff Inv. Secs. LLC*, 458 B.R. 87, 123 n.25 (Bankr. S.D.N.Y. 2011) (citing *Kirschner v. KPMG LLP*, 912 N.Y.S.2d 508, 528 (N.Y. 2010)). "[F]ederal courts have established a closely-related standing rule—the *Wagoner* rule—denying plaintiffs standing to bring certain claims in federal court in cases where the *in pari delicto* defense is implicated." *In re Salander*, 503 B.R. 559, 568 (S.D.N.Y. 2013). When a "bankrupt corporation has joined with a third party in defrauding its creditors, the trustee cannot recover against the third party for the damage to the creditors." *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991). "[B]ecause a trustee stands in the shoes of the corporation, the Wagoner rule bars a trustee from suing to recover for a wrong that he himself essentially took part in." *Wight v. BankAmerica Corp.*, 219 F.3d 79, 87 (2d Cir. 2000).

The *Wagoner* rule has limits, however. "[N]either the *Wagoner* rule nor the *in pari delicto* doctrine apply to a trustee's statutory standing under Section 544 of the Bankruptcy Code." *Salander*, 503 B.R. at 569 n.12; *see also In re Connie's Trading Corp.*, No. 14 Civ. 376 (LAK) (GWG), 2014 U.S. Dist. LEXIS 63730, at *17 (S.D.N.Y. May 8, 2014) (quoting the same). It follows that avoidance actions—for which the Trustee has statutory standing under 11 U.S.C. § 544—are not subject to the *Wagoner* rule or the *in pari delicto* doctrine. *Connie's Trading Corp.*, 2014 U.S. Dist. LEXIS 63730, at *17; *In re Madoff*, 848 F. Supp. 2d 469, 483 (S.D.N.Y. 2012), *aff'd sub nom In re Bernard L. Madoff Inv. Secs. LLC*, 740 F.3d 81 (2d Cir. 2014); *In re Marketxt Holdings Corp.*, 376 B.R. 390, 423 (Bankr. S.D.N.Y. 2007) ("Defendants ignore the fact that avoidance actions do not fall within the *Wagoner* rule."); *In re Park S. Secs., LLC*, 326 B.R. 505, 513 (Bankr. S.D.N.Y. 2005) ("[T]he Defendants' invocation of the '*Wagoner* Rule' is unavailing as

23

applied to the Trustee's fraudulent transfer causes of action. . . . The *Wagoner* Rule does not, however, apply to causes of action that the Bankruptcy Code specifically confers on a trustee or a debtor in possession.").

Here, the Trustee's claims to avoid the transfers alleged to have been actually fraudulent, in Counts I through V of the CPC complaint and Counts I through X of the First Citizens complaint, are brought under NYDCL § 276. The Trustee has statutory standing to pursue those state-law claims against a creditor under 11 U.S.C. § 544(b). Accordingly, the *in pari delicto* doctrine and the related *Wagoner* rule do not bar the Trustee's standing to bring avoidance claims, under § 544 of the Code.

**C.    A Ruling on the Statute of Limitations Defense Is Premature.**

In a further attempt to knock the legs out from under Counts I and II of the complaints, CPC and First Citizens argue that those Counts—seeking to avoid the transfers made in connection with the CPC#1 and CPC#2 Loans and the FC#1 and FC#2 Loans—are time-barred. (Case No. 16-2007, ECF No. 14 ¶¶ 89-98; Case No. 16-2005 at 20-22).

The CPC loans transactions took place on August 22, 2006. (Case No. 16-2007, ECF No. 14 ¶ 94). CPC asserts that the statute of limitations for actual fraud under New York law expired six years later, on August 22, 2012. (*Id.* ¶¶ 93-94). Cornerstone's bankruptcy petition, filed on July 15, 2013, was outside of that statutory period. (*Id.*). Further, CPC argues that "any possible argument by the Trustee that the statute of limitations did not run as of the Petition Date because it was not two years from the time the fraud was discovered or could have been discovered, is unavailing." (*Id.* ¶ 95). CPC reasons that if CPC knew or should have known of Cornerstone's fraud, then "a hypothetical creditor must have or should have known as well." (*Id.* ¶ 96).

24

The First Citizens loans at issue took place on April 21, 2006 and November 11, 2006. (Case No. 16-2005, ECF No. 16 at 20).  First Citizens asserts that the six-year statute of limitations for actual fraud expired on April 21, 2012 and November 11, 2012, respectively—both dates being before the July 15, 2013 date of the bankruptcy petition.  (*Id.* at 21).  First Citizens makes no mention of the discovery rule.

Under New York law, the statute of limitations for fraud is the "greater of six years from the date the cause of action accrued *or two years from the time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it*." NY CPLR § 213(8) (emphasis added).  In asserting the affirmative defense of the passage of the statute of limitations, the defendant bears the burden of proof.  *Bano v. Union Carbide Corp.*, 361 F.3d 696, 710 (2d Cir. 2004).  The Court must take "the well-pleaded allegations of the Complaint . . . as true, and a court cannot grant a motion to dismiss based on a statute of limitations where there is a factual question involved."  *In re Tronox Inc.*, 429 B.R. 73, 99 (Bankr. S.D.N.Y. 2010) (citing *Mandarino v. Mandarino*, 180 F. App'x 258, 261 (2d Cir. 2006) (reversing statute of limitations dismissal and holding that "the District Court should not have resolved the fact-specific equitable tolling issue")).  "Where it does not conclusively appear that a plaintiff had knowledge of facts from which the injury could reasonably be inferred, the complaint should not be dismissed on motion and the question should be left to the trier of fact." *Bano*, 361 F.3d at 710 (internal quotation marks omitted).

Here, the Court must take the Trustee's allegations as true—and the Trustee has invoked the discovery rule by alleging that the fraudulent scheme was not reasonably discoverable by at least one unsecured creditor by the petition date.  (Case No. 16-2007, ECF No. 7 ¶ 146; Case No. 16-2005 ¶ 170).  Because it does not conclusively appear that a creditor knew or should have known of

25

the alleged fraud before the date that Cornerstone filed its bankruptcy petition, the Court cannot dismiss Counts I and II of the complaints on statute of limitations grounds. There is no basis to impute CPC or First Citizens' alleged knowledge of the fraud to other creditors, as the banks would have it. Although the six-year statute of limitations may have run on Counts I and II of both complaints, the discovery rule may save those claims—and that fact question must be left to the trier of fact. Accordingly, a determination of whether the statute of limitations precludes pursuit of Counts I and II by the Trustee is premature.

## V.

### CONCLUSION

Under the pleading standard established by the Supreme Court in *Iqbal* and *Twombly*, and the heightened pleading standard required for claims alleging fraud as required by Rule 9(b) FRCP, the Court finds that the Trustee has adequately pled the claims for actual and constructive fraud, to survive a motion to dismiss under Rule 12(b)(6). *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Further, the common law defense of *in pari delicto*—and the related federal rule of standing under the *Wagoner* rule—do not, as a matter of law, strip the Trustee of standing to pursue the avoidance actions, brought under 11 U.S.C. § 544(b). *See In re Connie's Trading Corp.*, No. 14 Civ. 376 (LAK) (GWG), 2014 U.S. Dist. LEXIS 63730, at *16-17 (S.D.N.Y. May 8, 2014); *In re Madoff*, 848 F. Supp. 2d 469, 483 (S.D.N.Y. 2012), *aff'd sub nom In re Bernard L. Madoff Inv. Secs. LLC*, 740 F.3d 81 (2d Cir. 2014). As for the statute of limitations defense raised with respect to Counts I and II of each complaint, the Court finds that questions of fact exist concerning when the alleged fraud was or could have been discovered—starting the clock ticking on the statute of limitations—making a determination on that

26

issue premature. CPC's motion to dismiss Counts I through VIII of the complaint is **DENIED**.

First Citizens' motion to dismiss Counts I through X of the complaint is also **DENIED**.

**IT IS SO ORDERED.**


DATED: February 7, 2017          _____/s/_____
      Rochester, New York        HON. PAUL R. WARREN
                                United States Bankruptcy Judge